_____

|  |  |  |
|---|---|---|
| LAWRENCE A. FRANKS, STEVE SELLERS, GEORGE J. BROWN, CHARLES F. ROBBINS, JESSE R. FLOWERS, JR., JACK ATCHESON, and CONSERVATION FORCE, INC., | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | Civil Action No. 09-0942 (RCL) |
| | ) | |
| KEN SALAZAR, SECRETARY, United States Secretary of Interior, ROWAN GOULD, Acting Director of United States Fish & Wildlife Service, And UNITED STATES FISH & WILDLIFE SERVICE, | ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

_____ )

## MEMORANDUM OPINION

Thrill-seeking safari hunters willingly pay thousands of dollars for the privilege of shooting an African elephant. Sport hunting is legal in many African countries and can often benefit threatened elephant populations where the practice is carefully managed and revenue from hunting licenses is recycled into conservation programs. Without an effective wildlife management plan, however, the haphazard sport-killing of elephants may—intuitively enough— be detrimental to their survival as a species. For this and other reasons, the United States Fish & Wildlife Service ("the Service") determined that sport hunting in Mozambique would not "enhance" the survival of African elephants in that country—a prerequisite for allowing the import of a sport-hunted trophy into the United States. *See* 50 C.F.R. 17.40(e)(3)(iii)(C). Accordingly, the Service denied plaintiffs' request for permission to import their elephant

trophies from Mozambique into the United States.  The agency's decision is rational and is supported by the administrative record, and defendants are therefore entitled to summary judgment.

## I.    BACKGROUND

Owing in large part to a violent civil war that plagued the country from 1977 to 1992, Mozambique has struggled to maintain a healthy population of African elephants since the mid-1970's.  The number of elephants in Mozambique appears to have declined from between 50,000 and 65,000 in 1974 to an estimated 11,000 to 13,000 in 2002, though accurate population numbers during this time are somewhat elusive.  Administrative Record ("AR") 13, 725.  Much of the decline is directly attributable to illegal poaching for ivory, which the country has been unable to control effectively due to a lack of adequate resources.  AR 942-44, 1993-95.  But elephant populations have also suffered from defensive killings (to protect crops and property) and from the destruction of habitat.  *Id.*  Although Mozambique banned sport hunting in 1990, the ban was lifted in 1999 to allow a limited number of hunting licenses.  AR 947, 1998.

Mozambique and the United States are both parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249, which governs the import and export of threatened species between signatories.  CITES divides the species it governs into three Appendices; the African elephant is listed under Appendix I, the most protective category, which authorizes trade only in "exceptional circumstances."  *Id.* art. II(1).  "Trade" in Appendix I specimens requires a permit from the designated Scientific Authority of both the importing and exporting nations.  *Id.* art. III.

Before issuing an export permit for an Appendix I specimen, the Scientific Authority of the exporting country—here, Mozambique's National Directorate of Forestry and Wildlife

("DNFFB")—must find that the export of such a trophy "will not be detrimental to the survival of that species." *Id.* art. III(2)(a). Similarly, before issuing an import permit, the Scientific Authority of the importing country—here, the Service—must make a separate, independent determination that the import of an African elephant trophy "will be for purposes which are not detrimental to the survival of the species involved." *Id.* art. III(3)(a); *see* 50 C.F.R. § 23.61(a). These are commonly known as "non-detriment" findings.

The United States implements CITES through the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, which prohibits "trade in any specimens contrary to the provisions of the Convention." 16 U.S.C. § 1538(c)(1). Exercising its authority under § 1540(f), the Service has promulgated regulations setting out the various factors it considers in making non-detriment findings. *See* 50 C.F.R. § 23.61. The Service considers, for example, whether removal of an animal from the wild represents "sustainable use," *id.* § 23.61(c)(1), is part of a "management plan that is designed to eliminate over-utilization of the species," *id.* § 23.61(c)(2), or would "stimulate additional trade in the species," *id.* § 23.61(e)(3). These findings are based on the "best available biological information," and in cases where "insufficient information is available," the Service "take[s] precautionary measures and [is] unable to make the required finding of non-detriment." *Id.* § 23.61(f)(4).

A special rule for African elephants—created pursuant to 16 U.S.C. §§ 1533(d) and 1539(a)(1)(A)—flatly prohibits the "[i]mport or export [of] any African elephant," with a narrow exception for sport-hunted trophies. 50 C.F.R. § 17.40(e)(3)(iii). The sport-hunted trophy exception requires the Service to determine that "the killing of the animal whose trophy is intended for import would enhance survival of the species." *Id.* § 17.40(e)(3)(iii)(C). This is commonly known as an "enhancement" finding. Thus, in addition to the permit requirements of

50 C.F.R. § 23.61 regarding non-detriment findings, a successful permit application must comply with the special "enhancement" rule for African elephants.  *See id.* § 17.40(e)(3)(iii)(C).

The Service periodically receives permit applications from hunters seeking to bring home their trophies from African safaris.  In November 1998, several years after the end of hostilities in Mozambique, the Service opened a line of communication with officials in the DNFFB, Mozambique's wildlife agency, requesting their help in assessing the status of the country's elephant population.  Over the next several years, the Service sent Mozambique officials a series of written requests for information about the existence of an elephant management plan, domestic legislation related to elephant conservation, current population figures and sport-hunting quotas, the status of protected areas since the end of the civil war, and current estimates of illegal poaching activity.  AR 84-91, 500-03, 688-89.  Though Mozambique officials responded to these requests, the Service found their responses to be superficial and lacking in specific detail and scientific support.  *See* AR 92-96, 569-72, 851-53.  After several attempts to verify the requested information, the Service concluded that it did not have sufficient information to determine whether Mozambique had an elephant management plan, an accurate estimate of its elephant population, or the resources to control illegal poaching.  AR 627-35, 725-27.

These findings acquired significance for the plaintiffs in this case.  Lawrence A. Franks, Steve Sellers and George J. Brown each shot and killed at least one elephant in Mozambique between 2000 and 2006.  With the help of Conservation Force (a nonprofit organization acting as the hunters' "authorized representative"), they applied for permits to import their trophies into the United States.  Am. Compl. ¶ 99 (Doc. 29); *see* AR 318-19, 608-09, 671-72, 1047-48.  Charles F. Robbins and Jesse R. Flowers, Jr., who both intended to hunt elephants in

Mozambique between 2003 and 2005, filed similar permit applications prospectively. AR 490-91, 736-37.[1]

The Service did not act on these requests for several years. While the administrative record reflects that the delay was caused in part by the DNFFB's failure to provide adequate responses to the agency's written questionnaires, the record also establishes that the Service did not "prioriti[ze]" these permit applications. AR 504. The Service eventually apologized for the "extreme delay in responding to [plaintiffs'] request[s]" when it ultimately denied most of these applications in July 2006. AR 1021-24.[2] The Service explained that after repeated attempts to obtain information from Mozambique on the benefits of sport hunting, it was unable to make the required enhancement and non-detriment findings. *Id.*

The Service gave several reasons for this conclusion. First, it had been unable to verify whether Mozambique had an effective elephant management plan. Though the plaintiffs had accompanied their permit applications with a copy of the DNFFB's *National Strategy for the Management of Elephants in Mozambique*, AR 97-122, the Service concluded that this was merely the "first step" in the process of implementing an effective wildlife management plan. AR 1022. Second, the Service had been unable to obtain adequate information from Mozambique regarding its elephant population. For example, the DNFFB could not provide an accurate headcount of elephants in Mozambique or quantify the extent of illegal poaching and defensive killings, and its sport-hunting quotas were irrational and without scientific basis. *Id.*

---

[1] Defendants argue that plaintiffs Conservation Force and Jack Atcheson (the hunters' "booking agent") lack standing to challenge the Service's ultimate denial of these permit applications. *See* Mem. Supp. Defs.' Mot. Summ. J. ("Defs.' Mem.") at 6 n.1 (Doc. 50). However, because defendants are entitled to summary judgment on all claims, it is not necessary to address whether Conservation Force and Atcheson have established standing.

[2] Because the permit denial letters are identical in all material respects, citations to the record will refer to Franks' permit denial letter, AR 1021-24.

Finally, the Service expressed its view that Mozambique simply did not have the resources to enforce its existing conservation laws. *Id.*

After exhausting their administrative appeals, plaintiffs sued for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq.*, seeking judicial review of the denial of their import permit applications. Shortly after the plaintiffs filed their complaint in May 2009, the Service denied Brown's remaining permit applications on September 3, 2009. AR 1974-77. Plaintiffs then filed an amended complaint raising nine claims, including additional claims related to the denial of Brown's remaining permit applications. Am Compl. ¶ 162-206. The parties then moved for judgment on the administrative record, and the case is now ripe for summary judgment. *See* Mem. Supp. Pls.' Mot. Summ. J. ("Pls.' Mem.") at 41-42 (Doc. 48-1); Defs.' Mem. at 45. For the reasons that follow, the Court will deny plaintiffs' motion for summary judgment and grant defendants' cross-motion for summary judgment.

## II.     STANDARD OF REVIEW

Plaintiffs face a steep climb in challenging the Service's denial of their import permit applications, as the applicable standard of review is a formidable one. The APA—which governs judicial review of agency decisions under the ESA, *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982)—provides that a reviewing court may set aside agency action only when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Review under this standard is "highly deferential" and "presumes the agency's action to be valid." *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted).

In applying this standard, a federal court may not "substitute[e] its judgment for that of the agency." *Costle*, 657 F.2d at 283. Instead, the court's only role is to determine whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Resource Defense Council, Inc.*, 462 U.S. 87, 105 (1983) (citations omitted). Accordingly, the arbitrary and capricious standard "mandates judicial affirmance if a rational basis for the agency's decision is presented, even though [the court] might otherwise disagree." *Costle*, 657 F.2d at 283 (citations omitted).

To make matters worse for plaintiffs, federal courts are particularly deferential toward agency findings that involve "scientific determination[s]," *Baltimore Gas*, 462 U.S. at 103, since these findings are presumed to be the product of agency expertise. In such cases, the court "must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimum standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc).

Summary judgment is an appropriate mechanism for deciding the question of whether agency action is supported by the administrative record. *Occidental Engineering Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). In such cases, a federal district court "sits as an appellate tribunal" to review the purely legal question of whether the agency acted in an arbitrary and capricious manner. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Thus, in the special context of reviewing agency factfinding, judicial review is limited to the administrative record, *see* 5 U.S.C. § 706, and the burden is on plaintiffs to prove the particular manner in which the Service's actions are arbitrary and capricious. *City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002).

### III.    ANALYSIS

Defendants are entitled to summary judgment because the administrative record demonstrates that the Service acted rationally in denying plaintiffs' permit applications. The Court will begin with several claims in plaintiffs' amended complaint that confront insurmountable procedural obstacles. For the remaining claims, application of the arbitrary and capricious standard leads to the conclusion that the Service acted rationally in denying plaintiffs' request to import their elephant trophies.

### A.  Plaintiffs' failure-to-process claims are moot.

There is no longer any relief this Court can provide for several of plaintiffs' claims because the Service has already finished processing their permit applications. Claims II and III allege in part that the years of delay in responding to these requests "deprived the plaintiffs of meaningful process before the government divested them of their right to keep and enjoy their property" in violation of the Due Process clause of the U.S. Constitution and 5 U.S.C. § 706(2)(b). Am. Compl. ¶ 173.[3] Similarly, Claim VIII alleges that a decision on the plaintiffs' permit applications was "unlawfully withheld or unreasonably delayed" in violation of 5 U.S.C. § 706(1). *Id.* at ¶¶ 200-03. Plaintiffs request a declaratory judgment and order of mandamus requiring the Service to act on these permits without further delay.

These claims are moot to the extent they challenge the Service's failure to process plaintiffs' permit applications, because there is no longer any relief this Court can grant that will remedy the alleged injury. Plaintiffs filed their amended complaint on June 30, 2010, asking the Court to order the Service to act on the permits without further delay. However, as of September 9, 2009, the Service had finished processing the plaintiffs' permit applications. Thus, plaintiffs

---

[3] In their amended complaint, plaintiffs state that Claim III—which alleges a violation of their substantive due process rights—is "[i]ncorporated into Second Claim." Am. Compl. ¶ 176. The Court will therefore consider Claim III as raising the same grounds for relief as Claim II.

have already received the specific relief requested in their amended complaint. Because there is no further relief that this Court can afford plaintiffs on their failure-to-process claims, defendants are entitled to dismissal of Claims II, III and VIII to the extent they allege a failure to act.[4]

The Constitution's "case or controversy" requirement compels this conclusion. Federal courts are without authority to render advisory opinions that "cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971); *see Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90 (D.C. Cir. 1986) ("The doctrine of mootness is a logical corollary of the 'case or controversy' requirement of Article III."). In cases where the challenged conduct has already ceased and "there is no reasonable expectation that the wrong will be repeated, . . . it becomes impossible for the court to grant any effectual relief whatever to the prevailing party, . . . [and] any opinion as to the legality of the challenged action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal quotation marks omitted).

This Court has repeatedly reached the same result in similar cases challenging various failures to process import permit applications. *See Conservation Force v. Salazar*, — F. Supp. 2d —, 2011 WL 3874816, at *9 (D.D.C. Sept. 1, 2011); *Marcum*, 2011 WL 3805666, at *8-*9; *Conservation Force v. Salazar*, 715 F. Supp. 2d 99, 105 (D.D.C. 2010). In each of these cases, plaintiffs' claims regarding the Service's alleged failure to process their permit applications were moot because, while the litigation was pending, the Service denied the outstanding permit

---

[4] To the extent that Claims II and III also challenge the Service's denial of plaintiffs' permit applications on the merits under the APA's arbitrary and capricious standard, *see* Am. Compl. ¶ 173(a), the Court will consider these arguments along with Claims I and VII later in this Opinion. "It would be overly formalistic and, more importantly, a huge waste of time for the Court to consider the merits of [these claims] twice simply because plaintiffs repeat their allegations in more than one claim in their Amended Complaint." *Marcum v. Salazar*, — F. Supp. 2d —, 2011 WL 3805666, at *9 n.1 (D.D.C. Aug. 30, 2011).

applications.  Thus, as is the case here, the requested declaratory relief would amount to an improper advisory opinion.  *See Conservation Force*, 715 F. Supp. 2d at 105.

Plaintiffs argue that the Service's challenged conduct falls within an exception to the mootness doctrine for claims that are "capable of repetition, yet evading review."  Pls.' Reply Mem. Supp. Pls.' Mot. Summ. J. ("Reply Mem.") at 36 n. 5 (Doc. 54) (quoting *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009)).  But plaintiffs have not established their entitlement to this exception, which requires that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again."  *Del Monte*, 570 F.3d at 322 (quoting *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990) (en banc)).  Plaintiffs do not even allege that they intend to apply for import permits in the future, and there is no indication from the record that these particular plaintiffs will ever hunt African elephants again.  *See Conservation Force*, 715 F. Supp. 2d at 106.  Thus, plaintiffs cannot demonstrate a reasonable expectation that the Service will again delay the processing of their permit applications, and so they cannot overcome the mootness bar to these claims.  For these reasons, defendants are entitled to summary judgment on Claims II, III and VIII.

### B.  Plaintiffs' wrongful-permit-denial claims cannot be enforced via the ESA's citizen-suit provision.

Plaintiffs' Fifth and Ninth Claims allege that the Service's denial of their permit applications ran afoul of several affirmative duties under the ESA.  See Am. Compl. ¶¶ 182-87, 204-06.  But these claims cannot be brought under the ESA's citizen-suit provision because they allege merely a "maladministration" of the ESA—not any violation of its substantive prohibitions.  *See Bennett v. Spear*, 520 U.S. 154, 174 (1997).  Accordingly, defendants are entitled to dismissal of Claims V and IX.

In Claim V, plaintiffs argue that the ESA obligates the Service to "encourage, cooperate with and support" the conservation programs of foreign nations, *see* 16 U.S.C. § 1537(b)(1), and to "do all things necessary and appropriate to carry out" its designated functions under CITES, *see id.* § 1537a(b). Am. Compl. ¶¶ 182(b), 185. In Claim IX, plaintiffs further argue that the ESA requires the Service to "consult with" the Secretary to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2); *see* Am. Compl. ¶ 204. Plaintiffs claim that the Service's denial of their permit applications violated these affirmative duties.

These claims cannot be enforced via the ESA's citizen-suit provision, 16 U.S.C. § 1540(g)(1), because they allege merely a "maladministration" of the ESA. *See Bennett*, 520 U.S. at 174. Section 1540(g)(1) provides in relevant part:

> [A]ny person may commence a civil suit on his own behalf—(A) to enjoin any person, including the United States and any other governmental instrumentality . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or . . . (C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary.

16 U.S.C. § 1540(g)(1). Because plaintiffs do not allege that the Service failed to perform any non-discretionary duty under section 1533, they are not eligible for judicial review under subsection (C).[5]

Nevertheless, plaintiffs cannot maintain their claims under subsection (A) either, because the Supreme Court has interpreted that section to allow an individual to commence a civil suit

---

[5] In their motion for summary judgment, plaintiffs argue—for the first time—that the Service also failed to perform its duties under 16 U.S.C. §§ 1533(b)(1)(A) and 1533(b)(5)(5), which require the Service to "take into account" the conservation efforts of foreign nations and to give notice of proposed regulatory changes to any foreign nations whose species may be affected. Pls.' Mem. at 32-33. But even if the Court agreed with plaintiffs' apparent implication that these sections impose "non-discretionary" duties (and that proposition is at least questionable), plaintiffs cannot use their summary judgment briefing to press claims not raised in their amended complaint. *See Winder v. District of Columbia*, 555 F. Supp. 2d 103, 110-11 (D.D.C. 2008).

only to enforce substantive prohibitions of the ESA, not to attack the Service's implementation of the ESA. *Bennett*, 520 U.S. at 174. The Supreme Court explained that the term "'violation' . . . cannot be interpreted to include the Secretary's maladministration of the ESA," *id.*, since such a broad reading would render superfluous subsection (C)'s careful limitation to the Secretary's failure to perform nondiscretionary duties under 16 U.S.C. § 1533, *id.* at 172.

Here, Claim V does not allege that the Service committed any act prohibited under § 1538 ("Prohibited Acts"). Rather, plaintiffs allege that the Service "violated" several aspirational provisions that govern how the Service implements the ESA and, by extension, CITES. See Am. Compl. ¶¶ 181-87. These are precisely the sort of "maladministration" claims that cannot be enforced through the ESA's citizen-suit provision. *See Bennett*, 520 U.S. at 174. This Court and others have recently applied *Bennett* to foreclose private enforcement of similar claims. *See Marcum*, 2011 WL 3805666, at *11 (holding that plaintiffs' complaints about wrongful permit denials could not be brought via the ESA's citizen-suit provision); *Conservation Force v. Salazar*, 753 F. Supp. 2d 29, 34 (D.D.C. 2010) (same); *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1211-12 (N.D. Cal. 2009) (same). For these reasons, defendants are entitled to dismissal of Claims V and IX.

### C. The Service did not engage in formal rulemaking requiring compliance with the APA's notice and comment procedures.

Plaintiffs' Fourth Claim alleges that in rationalizing the denial of their permit applications, the Service promulgated several new "rules" requiring formal public notice and comment under the APA, 5 U.S.C. § 553, and the Federal Register Act, 44 U.S.C. § 1505-07. Am. Compl. ¶¶ 177-81. Specifically, plaintiffs claim that conditioning the grant of a permit on the presence of a national management plan and a "precise individual count of elephants" in Mozambique amounted to the creation of new "rules" for issuing import permits. *Id.* ¶ 179.

However, the APA's notice-and-comment procedures do not apply to agency "adjudications" (as opposed to formal rulemakings), and "[a] permit decision-making proceeding is clearly adjudication rather than rule-making." *National Wildlife Federation v. Marsh*, 568 F. Supp. 985, 992 n.12 (D.D.C. 1983).

The Supreme Court has explained the "basic distinction between rulemaking and adjudication" as a difference between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Stated differently, the "central distinction between rulemaking and adjudication" is that "rules have legal consequences only for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216-17 (1988) (Scalia, J., concurring). This Court recently applied these principles in a materially indistinguishable case, holding that the Service's denial of plaintiffs' requests to import elephant trophies from Zambia were adjudications rather than rulemakings. *Marcum*, 2011 WL 3805666, at *13-*14.

These same principles lead to the same result here. As in *Marcum*, the Service here confronted a specific group of permit applicants and evaluated their claims against the existing regulatory standards set forth in 50 C.F.R. §§ 23.61 and 17.40(e)(3)(iii)(C). Applying those standards, the Service found that it lacked sufficient information to conclude that plaintiffs' proposed import would not be detrimental to the survival of African elephants, *id.* § 23.61(a), or enhance their survival, *id.* § 17.40(e)(3)(iii)(C). These decisions do not bind future permit applicants and do not even bar the specific plaintiffs in this case from filing new applications. Thus, they simply are not "rules" under the APA, since they are not intended to have "future effect." 5 U.S.C. § 551(4). Nor did the concerns articulated in the permit denial letters become

"rules" simply because the Service relied on them in reaching its decisions. Because the permit denials were adjudications rather than rulemakings, plaintiffs' claim that the Service should have engaged in formal notice-and-comment procedures fails as a matter of law.

Plaintiffs nevertheless argue that the Service's decision to deny their permit applications in part because Mozambique did not have a national management plan or accurate population numbers violated a stipulation in *Safari Club International v. Babbitt*, No. 91-2523, 1994 U.S. Dist. LEXIS 18183 (D.D.C. Dec. 14, 1994), a case previously before this Court. In that case, Safari Club challenged the Service's internal guidelines for issuing elephant trophy permits on the ground that these guidelines had not undergone public notice and comment. This Court agreed, and thereafter, in exchange for the Service's withdrawal of the guidelines, the parties stipulated to dismissal of Safari Club's complaint. Plaintiffs in this case claim—with some justification—that the withdrawn guidelines overlap somewhat with the regulatory factors the Service applied in denying their permit applications. Am. Compl. § 180. However, as this Court concluded in *Marcum*, that by itself does not mean the Service has reinstated the withdrawn guidelines in violation of the stipulation. *See Marcum*, 2011 WL 3805666, at *14 n.3. Nothing in plaintiffs' motion for summary judgment suggests the Service relied on the withdrawn guidelines as opposed to simply applying the regulatory factors under 50 C.F.R. §§ 23.61 and 17.40(e)(3)(iii)(C). For all of these reasons, defendants are entitled to summary judgment on Claim IV.[6]

---

[6] Plaintiffs' related argument under Claim IV—that "Defendants failed to provide the country of Mozambique with notice, an opportunity to comment, and 90 days notice before implementing their new policy" in violation of 16 U.S.C. § 1533(b)(5), Am. Compl. ¶ 181(a)—fails for the same reason. Because the Service did not engage in rulemaking when denying plaintiffs' permit applications, it was not obligated to provide Mozambique with notice and an opportunity to comment. Nor did the Service ever require that "all information come directly from the Mozambique authorities rather than the applicant." Am. Compl. ¶ 181(b).

Likewise, the Service did not create a "new rule" in limiting the scope of plaintiffs'

requests for reconsideration to information that was relevant to their initial permit applications.

Claim VI alleges that in the final permit denial letter, the Service notified plaintiffs that they

could request reconsideration of its decision to deny their applications, and that the

reconsideration would be based on the information provided in the original application or on

information the Service had at the time of the denial.  Am. Compl. ¶¶ 188-93; *see* AR 1024.

Plaintiffs argue that this constituted an amendment of 50 C.F.R. § 13.29, which they claim

allows an applicant to provide "new information" when submitting a petition for

reconsideration.[7]  Am. Compl. ¶ 190.

Plaintiffs read § 13.29 too broadly.  What that section actually says is that a request for

reconsideration may "includ[e] any new information or facts *pertinent to the issue(s) raised by

the request for reconsideration*."  50 C.F.R. § 13.29(b)(3) (emphasis added).  Thus, contrary to

plaintiffs' suggestion, § 13.29 does not permit an aggrieved applicant to supplement the

administrative record willy-nilly with information wholly untethered to the original permit

application.  The Service could reasonably apply § 13.29 as limiting the scope of new

information admissible in a request for *re*consideration to issues actually considered in the

original permit application.  And in so doing, the Service did not engage in rulemaking requiring

public notice and comment.  *See* 5 U.S.C. § 553.  In any event, it appears plaintiffs were not

deterred by the language in their denial letters, since they submitted "reams of information and

_____

[7] Plaintiffs' amended complaint refers to 50 C.F.R. § 13.29(e), which addresses an "appeal" from the denial of a request for reconsideration.  Am. Compl. ¶ 190.  But the basis for Claim VI is language in the initial permit denial letters allegedly limiting the information plaintiffs could submit along with the request for reconsideration itself.  *Id.*; *see* AR 1024.  Defendants suggest, and the Court assumes, that plaintiffs intend to invoke § 13.29(b)(3), which addresses the scope of new information that may accompany a request for reconsideration.  Defs.' Mem. at 41.

reports" with their requests for reconsideration. Pls.' Mem. at 40. Thus, defendants are entitled

to summary judgment on Claim VI as well.

### D. The Service acted rationally in denying plaintiffs' permit applications.

That leaves plaintiffs' final argument—that the Service's denial of their permit

applications was arbitrary and capricious. Plaintiffs' remaining claims fail on the merits under

the "highly deferential" arbitrary and capricious standard of review. *See Costle*, 657 F.2d at 283.

The administrative record demonstrates that the Service acted rationally in denying plaintiffs'

permit applications because the agency considered the relevant statutory and regulatory factors

and provided a rational explanation for its decision. *See id.* Plaintiffs therefore cannot rebut the

"strong presumption in favor of upholding decisions of the Service." *American Wildlands v.*

*Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007) (internal quotations marks omitted).

Recall that to grant a permit application, the Service must find that the import would be

for purposes that are "not detrimental" to the survival of the species, 50 C.F.R. § 23.61(a), and

indeed would serve to "enhance" the survival of the species, *id.* § 17.40(e)(3)(iii)(C). In making

these decisions, the Service considers the various factors set out in § 23.61(c) and (e), *see* 16

U.S.C. § 1540(f), and makes factual findings regarding these factors based on the "best available

biological information," 50 C.F.R. § 23.61(f)(4). Where "insufficient information is available,"

the Service "take[s] precautionary measures and [is] unable to make the required finding of non-

detriment." *Id.* Importantly, the permit applicant bears the burden of providing sufficient

information to support a non-detriment finding. *Id.* § 23.61(c).

The administrative record demonstrates that the Service considered the relevant statutory

and regulatory factors and provided a rational explanation for its findings with respect to each

factor. First, the Service considered whether the sport hunting at issue was "part of a

biologically based sustainable-use management plan that is designed to eliminate over-utilization

of the species." 50 C.F.R. § 23.61(c)(2). Based on the responses it received from Mozambique

officials, the Service concluded that it lacked "sufficient information" to find that Mozambique

had implemented an effective elephant management plan. AR 1022. Indeed, the record suggests

that Mozambique's conservation efforts were poorly organized, underfunded, and in no position

to oversee the controlled killing of elephants. AR 866-67.

       Plaintiffs claim that Mozambique had such a plan: the DNFFB's *National Strategy for*

*the Management of Elephants in Mozambique*. AR 97-122. But the Service found that the

*National Strategy* was just a "first step" toward a comprehensive wildlife management plan, and

that it had not yet been implemented—or even ratified—by the Government of Mozambique. As

the Service explained:

> No details were provide on specific research or survey projects to be conducted,
> how DNFFB's capacity to manage and protect elephants would be accomplished
> both legislatively and financially, and nothing to indicate what would be done
> about human-elephant conflicts. We are not aware of any comprehensive plan
> that provided local communities with a stake in managing, protecting, and
> conserving elephants as both a natural and economic resource. In addition, it is
> not clear what level of legislative or financial commitment the Government of
> Mozambique would provide towards managing its elephant populations.

AR 1022. In light of this uncertainty, the Service could rationally take "precautionary measures"

and find that the "best available" information did not establish the existence of an effective

elephant management plan. *See* 50 C.F.R. § 23.61(f)(4). And contrary to plaintiffs' suggestion,

the record reflects that the Service expressly considered and discussed the *National Strategy* in

processing plaintiffs' permit applications. AR 1022. Plaintiffs simply dislike the Service's

discretionary finding that this was not a "management plan." *See* 50 C.F.R. § 23.61(c)(2).

       Plaintiffs resist this conclusion, pointing to the existence of two community-based

conservation projects in Mozambique—the Tchuma Tchato Community Project and the Niassa

Game Reserve—which provide localized oversight of elephant herds through the financial support of private donors and non-government organizations like the World Wildlife Fund. Plaintiffs tout the success of these local projects and argue that because Franks, Sellers and Brown each shot their elephants in one of these community-based reserve areas, the Service should have evaluated the existence of an elephant "management plan" at the local level—rather than, as it did, at the "nationwide" level. Pls.' Mem. at 21-22.

But the Service had good reason to adhere to its "countrywide" approach. The administrative record reflects that these community-based projects were designed by professional wildlife biologists from other countries and are totally dependent on private donations and NGO funding for their survival. Although the Government of Mozambique has given its blessing to these projects, they are not government-sponsored programs and include only a fraction of the country's elephant population. And while revenue from the sale of hunting licenses in these areas was being distributed among the national and local governments and the community, AR 869, there is no evidence that this money was actually being recycled back into the maintenance of local elephant reserves.

Plaintiffs point out that in the letters informing them of the denial of their requests for reconsideration, the Service stated that it "supports the formulation of a comprehensive plan for community-based management of natural resources that could provide local communities with a stake in the management and conservation of elephants." AR 1958. But it was precisely the lack of a "comprehensive plan" for the use of these local projects that the Service found troubling. And even the existing community-based projects to which plaintiffs refer were not financially self-sustaining at the time plaintiffs submitted their requests. AR 1958 ("Although some community-based projects have been established and are currently operating in Mozambique,

they were not functioning at the time you took your trophy."). Thus, the Service acted rationally in finding that the Tchuma Tchato and Niassa projects were not the equivalent of a "biologically based sustainable-use management plan." *See* 50 C.F.R. § 23.61(c)(2).

Second, the Service considered a number of factors generally addressing whether, despite the absence of a management plan, the sport-hunting of elephants in Mozambique was nevertheless "sustainable." 50 C.F.R. § 23.61(c)(1). These factors include, for example, whether sport hunting "would not contribute to the over-utilization of the species," *id.* § 23.61(c)(3), "would pose no net harm to the status of the species in the wild," *id.* § 23.61(c)(4), and "would not stimulate additional trade in the species," *id.* § 23.61(e)(3). The Service again concluded that it lacked "sufficient information" to make these findings because it had been unable to obtain adequate responses from the Mozambique government regarding its elephant population. AR 1021-24.

The Service found several deficiencies in the information supplied by Mozambique. For one thing, the DNFFB could not provide actual population numbers for elephants in Mozambique or quantify the extent of illegal poaching and defensive killings. *Id.* at 1022. The Service explained that:

> [M]ost of the information on elephant population size, distribution, and dynamics is based on informed guesses. As of 2005, there has been a lack of adequate research and survey work to be able to establish the actual population numbers and the extent that migration impacts population estimates.

*Id.* For another thing, the Service found that there was insufficient evidence that Mozambique's elephant hunting quotas were scientifically based and sustainable. *Id.* The Service explained that the hunting quotas were irrational and disconnected from the government's own policy on sport hunting. AR 1022-23. For example, in 1997 and 1998, Mozambique established export quotas of 50 and 20 elephants respectively, even though there was a ban on sport hunting of

elephants until 1999.  AR 1022.  But *after* the ban on sport-hunting was lifted, Mozambique officials claimed that the quota was reduced to 10 elephants per year.  *Id.*  There was apparently "no scientific basis upon which these quotas have been established each year" since "the actual elephant population in Mozambique is not currently known."  *Id.*  And for a third thing, the DNFFB's vague responses regarding the extent of illegal poaching and defensive killings "raise[d] concerns about what impact any level of take involving elephant sport-hunting is having on the wild population."  *Id.* at 1023.

Plaintiffs claim that the Service's insistence on "actual population numbers" was unlawful, arguing that the ESA was amended in 1982 to eliminate population estimates as a precondition for non-detriment findings.  *See* 16 U.S.C. § 1537a(c)(2) ("[T]he Secretary . . . is not required to make, or require any state to make, estimates of population size in making such determinations.").  Plaintiffs rely on *Defenders of Wildlife v. Endangered Species Scientific Auth.*, 725 F.2d 726 (D.C. Cir. 1984), in which the D.C. Circuit stated that population estimates are no longer a valid requirement for non-detriment findings.  But the fact that the Service "is not required to make . . . estimates of population size" does not mean the Service may not *consider* the absence of reliable population data as a factor in making a discretionary non-detriment finding.  After all, the Service must still base its determination on the "best available biological evidence."  16 U.S.C. § 1537a(c)(2).  And even *Defenders of Wildlife* recognizes that the statutory amendment preserves "the discretion of the Secretary" to consider population estimates. 725 F.2d at 731.

Third, the Service concluded that Mozambique simply did not have the financial or human resources to manage the sport hunting of elephants.  AR 1023.  The Service reasoned that although domestic laws relating to elephant conservation in Mozambique had been in place for

many years, it was difficult for the DNFFB to enforce these laws due to inadequate resources.

*Id.* The Service explained:

> There seemed to be a severe shortage of manpower and a need for properly trained staff at all levels of the Directorate. There also appeared to be a lack of material resources to enable the staff to carry out their duties, and a lack of financial resources in terms of remunerating staff and providing funding for management operations and projects. Due to this apparent lack of financial support for wildlife management, the level of illegal hunting in Mozambique [between 2000 and 2005] was difficult to assess. Indications are that the level of poaching was still high, due in part to people settling or re-settling in portions of the elephants['] range since the end of civil war. The difficulties in controlling illegal hunting were compounded by an abundance of firearms that have remained in circulation since the end of the war.

*Id.* Thus, the Service concluded that Mozambique's lack of sufficient resources to protect and manage elephants weighed against finding non-detriment and enhancement. For all of these reasons, the Service concluded that it was unable to find that sport hunting would "enhance" the survival of elephants in Mozambique. *See* 50 C.F.R. § 17.40(e)(3)(iii)(C).

In their motion for summary judgment, plaintiffs develop several additional arguments in general opposition to the agency's findings, all unavailing. Plaintiffs contend, for example, that CITES Resolution 2.11 requires the Service to defer to Mozambique's non-detriment finding. Pls.' Mem. at 34-36. But this is a misreading of the resolution. Resolution 2.11 provides that "the Scientific Authority of the importing country" should "accept the finding of the Scientific Authority of the exporting country that the exportation of the hunting trophy is not detrimental to the survival of the species, *unless there are scientific or management data to indicate otherwise*." CITES Conf. 2.11(b) (Rev.) (Mar. 1979) (emphasis added). Indeed, Resolution 2.11 goes on to state that "the scientific examination by the importing country" must "be carried out independently of the result of the scientific assessment by the exporting country." *Id.* at 2.11(c).

Thus, the resolution in question indicates rather clearly that the importing signatory must ultimately make its own, independent non-detriment finding in order to issue an import permit.

What is more, this argument overlooks the special rule flatly prohibiting the import of African elephant trophies absent a separate "enhancement" finding. *See* 50 C.F.R. § 17.40(e)(3)(iii)(C). Plaintiffs protest that the "enhancement" rule is contrary to CITES Resolution 2.11, or that Resolution 2.11 somehow "repealed" § 17.40(e)(3)(iii)(C). Pls.' Mem. at 30. But CITES resolutions do not create enforceable legal standards; instead, they are merely recommendations "intended to give guidance to the Parties in implementing the Convention." *Castlewood Products, L.L.C. v. Norton*, 365 F.3d 1076, 1084 (D.C. Cir. 2004). Besides, CITES itself expressly allows signatory nations to enact "stricter domestic measures regarding the conditions for trade" in threatened species than the specific provisions of CITES. CITES, art. XIV(1)(a), 27 U.S.T. 1087. And in any event, § 17.40(e)(3)(iii)(C) was promulgated pursuant to the Secretary's authority under the ESA to issue "such regulations as he deems necessary and advisable" for the protection of a threatened species. *See* 16 U.S.C. § 1533(d). So plaintiffs are reduced to challenging the Secretary's statutory authority under § 1533. Thus, their apparent facial challenge to the special "enhancement" rule fails as a matter of law.

Finally, plaintiffs argue generally that sport hunting does enhance the survival of elephant populations because trophy hunting fees can be used by local governments to control poaching and compensate local property owners for damage caused by elephants. It is certainly true that, as an abstract matter, sport hunting may result in a net benefit to African elephant populations under controlled circumstances. Indeed, Congress has expressly so found. 16 U.S.C. § 4202(9) ("[T]here is evidence that the proper utilization of well-managed elephant populations provides an important source of funding for African elephant conservation programs."). But plaintiffs'

general argument does not undermine the Service's conclusion that, in this particular case, there was insufficient evidence to find that Mozambique's elephant population was "well-managed" and that the killing of African elephants would enhance their survival as a species.

To be sure, the administrative record includes several hundred pages of expert opinion extolling the benefits of sport-hunting in aid of conservation efforts. AR 1608-1812. Plaintiffs make much of the report of Dr. James Teer, a professor of wildlife science at Texas A&M University, who—at the behest of Conservation Force—personally traveled to Mozambique and conducted a week-long survey of elephant conservation and management in that country. AR 290-308. Dr. Teer concluded that it "seems prudent and safe to continue harvesting a small number of elephants each year until evidence suggests that the population is being impacted." *Id.* at 307. Plaintiffs argue that the Service entirely failed to consider the opinion of Dr. Teer and other experts in making its negative enhancement and non-detriment findings, and that the Service's contrary conclusion was arbitrary and capricious. Pls.' Mem. at 4, 7.

But there is no requirement that the Service specifically cite and rebut every piece of evidence favorable to a permit applicant. Besides, Dr. Teer's opinion actually supports the Service's negative non-detriment and enhancement findings in several places. Dr. Teer's own report states, for example, that "[m]ost African range states simply do not have the resources required to conduct intensive research and monitoring projects." AR 292. Nor would the Court have faulted the Service for refusing to give Dr. Teer's report any weight, since it was not based on a comprehensive survey of Mozambique's elephant population and instead was limited to a small subset of that population. But most importantly of all, even if the Court disagreed with the Service's conclusions regarding the benefits of sport hunting in Mozambique, the arbitrary and capricious standard of review simply does not authorize this Court to second-guess the agency's

findings.  *See Costle*, 657 F.2d at 283.  So although plaintiffs disagree with the Service's assessment of the alternative opinions in the record, that does not provide a basis for this Court to overturn the denial of their permit applications.  Thus, defendants are entitled to summary judgment on Claims I and VII.

**IV.     CONCLUSION**

For these reasons, plaintiffs' motion for summary judgment is denied and defendants' cross-motion for summary judgment is granted.  A separate order memorializing these conclusions will issue this day.

Date: October 6, 2011                                        _____/s/_____
                                                             Royce C. Lamberth
                                                             Chief United States District Judge